### In re Tracy Lynn GALYON, Debtor.

### No. 06–11985 WV.

United States Bankruptcy Court,
W.D. Oklahoma.

March 22, 2007.

---

Mike J. Rose, Oklahoma City, OK, for Debtor.

Herbert M. Graves, Oklahoma City, OK, Assistant United States Trustee.

## *MEMORANDUM OPINION*

T.M. WEAVER, Chief Judge.

Before the court is Motion of the United States Trustee to Dismiss Case Pursuant to 11 U.S.C. § 707(b)(1) Based on the Presumption of Abuse Arising under 11 U.S.C. § 707(b)(2) ("motion"), in response to which was filed Debtor's Objection to the United States Trustee's Motion to Dismiss Pursuant to 11 U.S.C. § 707(b) and Brief in Support Thereof, ("objection"). The motion raises the issue of whether, for purposes of the means test calculation under § 707(b)(2)[1], the debtor may deduct payments to a secured creditor whose collateral the debtor intends to surrender. Under § 707(b)(2)(A)(iii)(*l*),

the deduction is allowed for payments "scheduled as contractually due." The court concludes that the plain meaning of the quoted phrase is that payments on secured indebtedness on which the debtor is contractually liable as of the date of the filing of the bankruptcy petition (the "petition date") may be deducted in the means test calculation. Because the debt in the present case is indebtedness on which the debtor was contractually liable as of the petition date, the deduction for the payments should be allowed, despite the debtor's expressed intention to surrender the collateral.

The relevant facts are quite straight forward and undisputed. When the debtor filed her bankruptcy petition, she was indebted on three mortgage loans and the credit purchase of a heating and air conditioning unit, all four debts being secured by her former residence (collectively, the "mortgage indebtedness"). She had moved from the residence and was residing in her parents' home on the petition date. She listed the mortgage indebtedness in her bankruptcy schedules. Among her bankruptcy filings was a Statement of Intention in which she declared the intention to surrender the dwelling which secured the mortgage indebtedness. The debtor's Statement of Current Monthly Income and Means Test Calculation (Form B22A) concludes that the § 707(b)(2) presumption of abuse does not arise. The Statement of Presumed Abuse of the United States Trustee ("UST") and the motion contend otherwise. The debtor's means test calculation included a deduction for the payments due on the mortgage indebtedness during the ensuing 60 months after the petition date. The UST maintains that the deduction is not permitted because of

---

1. Unless otherwise specifically stated, all references to sections herein are to title 11 of the United States Code.

the debtor's intention to surrender the collateral. Both parties agree that, if the deduction is allowed, there is no presumption of abuse and the motion should be denied. Conversely, they agree that, without the deduction, the presumption of abuse does arise. In the latter event, the debtor maintains that the presumption is rebutted by the presence of "special circumstances" under § 707(b)(2)(B). The UST denies the existence of such "special circumstances".

By the time of the hearing on the motion, the creditor secured by the first mortgage on the subject dwelling had successfully obtained relief from the automatic stay from this court.

### Jurisdictional Statement

The court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 157 and 1334 and the order of the District Court authorizing referral of proceedings to the bankruptcy judges. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and, to the extent the proceeding may be non-core, the parties have consented to the entry of final judgment by the court.

### Discussion

■ The analysis begins with a recognition of the context in which the legal issue arises. Section 707(b)(2), enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPC-PA"), provides that a presumption of abuse will arise under certain prescribed circumstances if a debtor's income exceeds the median family income for the applicable state and family size. If not rebutted, the presumption may result in the dismissal of the debtor's chapter 7 bankruptcy proceeding or, with the debtor's consent, the conversion of the case to one under chapter 11 or 13. Whether the circumstances in a particular debtor's case cause the presumption of abuse to arise is determined by lengthy and complicated calculations, commonly referred to as the "means test" or "means test calculation." The means test calculation must be made by the debtor by completing and filing with his schedules Official Form B22A. FED. R.BANKR.P. 1007(b)(4).[2]

The first step in the calculation is to determine the debtor's average monthly income during the six-month period preceding the petition date (the "current monthly income"). Official Form B22A. From the current monthly income certain deductions are made in order to determine whether a presumption of abuse arises. The allowable deductions include certain "applicable monthly expense amounts" for items such as food, clothing, utilities, transportation and the like, which are not actual expenses of the debtor, but rather are amounts "specified under the National Standards and Local Standards." § 707(b)(2)(A)(ii)(I). The National Standards and Local Standards referred to are issued by the Internal Revenue Service. *Id.* and Official Form B22A. Deductions are also allowed for certain actual expenses of the debtor. Among the deductible actual expenses are the debtor's "average monthly payments on account of secured debts". Included in this calculation is "the total of all amounts *scheduled as contractually due* to secured creditors in each month of the 60 months following the date of the petition"; ... § 707(b)(2)(A)(iii)(I) (italics added). Whether the payments on the mortgage indebtedness of the debtor are amounts "scheduled as contractually due" as used in this statutory provision is the issue before the court.

---

**2.** Certain disabled veterans are exempt from the requirement. § 707(b)(2)(D).

This issue has been addressed in relatively few cases, owing probably to the short time in which BAPCPA has been in effect, with varying results. The earliest case, *In re Walker*, 2006 WL 1314125 (Bankr.N.D.Ga. May 1, 2006) ("*Walker*"), took a "plain meaning" approach and concluded that the common meaning of "scheduled as contractually due" was "those payments that the debtor will be required to make on certain dates in the future under the contract." *Id.* at *3. *Walker* determined that the means test was to be applied as of the petition date. Thus, "nothing the debtor does or does not do changes the fact that scheduled payments remain contractually due." *Id.* at *4. Since the debtors there were contractually obligated to make the payments when they filed bankruptcy, the deduction for the payments was allowed, despite the debtors' expressed intention to surrender the collateral. The recent opinion in *In re Nockerts*, 357 B.R. 497 (Bankr.E.D.Wis. 2006) ("*Nockerts*") adopts *Walker's* reasoning in a thorough analysis. The debtor relies on *Walker* in support of her position.

Representing the contrary view of the UST is *In re Skaggs*, 349 B.R. 594 (Bankr. E.D.Mo.2006) ("*Skaggs*"). *Skaggs* took a "holistic" approach to the construction of the statutory language, being guided not by a single sentence or word, but looking " to the provisions of the whole law and to its object and policy." *Id.* at 599 (quoting *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 44 L.Ed.2d 525, (1975)). *Skaggs* determined that, since the term "scheduled as" was used elsewhere in the Bankruptcy Code to refer, not to the common dictionary meaning, but to whether a debt is reflected on a debtor's bankruptcy schedules (citing § 1111(a)), the same meaning should be applied in construing § 707(b)(2)(A)(iii)(I). Thus, the court should determine from "the debtor's schedules and statements whether a debt is scheduled as contractually due." *Skaggs*, 349 B.R. at 599. The court did not articulate why a debtor's "statements" would affect whether a debt was scheduled. Yet, because the debtor there had filed a Statement of Intention indicating that it would surrender the collateral, the court did not allow the deduction of the payments on the secured debt, although the debt was listed on the debtor's schedules. *Skaggs* also stressed that its conclusion was in line with the intent of the drafters of BAPCPA. "A primary intent of Congress in the passage of BAPCPA was to ensure that those debtors who can pay their debts do so." *Id.* at 600.

The UST also relies on *In re Love*, 350 B.R. 611 (Bankr.M.D.Ala.2006) and *In re Harris*, 353 B.R. 304 (Bankr.E.D.Okla. 2006). *Love* held that in calculating the debtor's disposable income for Chapter 13 plan confirmation purposes, there could be no deduction for payments on debt secured by collateral which the debtor had proposed to return to the secured parties. Rejecting the *Walker* rationale, the court reasoned that the debtor's chapter 13 plan is "necessarily a forward looking document". Therefore, the term "scheduled" in § 707(b)(2)(A)(iii) refers to "something which one expects to take place in the future and not an event which one plans to avoid." *Id.* at 613.

*Harris* is a presumption of abuse case which reached the same result as *Skaggs* and *Love*. Citing *Love*, the court in *Harris* concluded that a debtor who surrenders collateral is no longer required to make the scheduled payments on the underlying debt. This is a puzzling conclusion with which this court respectfully disagrees. It seems fundamental that, absent a contrary (and unusual) provision in the loan or security documents, a debtor remains obligated to make the payments scheduled on the debt until the debt is satisfied, even if the

collateral is surrendered. See *Walker*, at *4. Otherwise, a debtor who desires to be relieved of the obligation to make payments on his debt need only return the collateral to the creditor. In rejecting the *Walker* approach, *Harris* concluded that "[t]he means test was intended to 'ensure that those who can afford to repay some portion of their unsecured debts [be] required to do so.'" *Harris*, 353 B.R. at 309 (quoting *In re Hardacre*, 338 B.R. 718, 725 (Bankr.N.D.Tex.2006)).

Between the opposite conclusions of *Walker* and *Skaggs* is *In re Singletary*, 354 B.R. 455 (Bankr.S.D.Tex.2006) ("*Singletary*"). *Singletary* agreed with *Walker* that the debtor's mere act of declaring an intent to surrender the collateral did not extinguish the debtor's obligation to make the scheduled payments and thus, did not prevent a deduction for the payments for purposes of the means test. *Singletary* parted company with *Walker*, however, as to the relevant date on which the presumption of abuse determination was to be made. According to the court in *Singletary,* the date the motion to dismiss was filed was the operative date, and not the petition date. Consequently, if the collateral had actually been surrendered before the motion was filed, then the deduction would not be allowed. Thus, *Singletary* would allow post-petition events to be considered in the means test calculation so long as they preceded the filing of a motion to dismiss. Although finding the analysis in *Walker* to be logical and as presenting an appealing policy argument, *Singletary* felt obligated to follow what it considered the controlling precedent of *In re Cortez*, 457 F.3d 448 (5th Cir.2006), a substantial abuse case under pre-BAPCPA § 707(b).

While reaching different conclusions, all of these cases seem to be in basic agreement on the law to be applied in interpreting the statutory provision at issue. The exercise "must begin with the language of the statute itself." In re *T.H. Orlando, Ltd.*, 391 F.3d 1287, 1291 (11th Cir.2004). "The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *United States v. Ron Pair Enterprises, Inc.* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). The court "should give effect, if possible, to every clause and word of a statute." *Moskal v. U.S.*, 498 U.S. 103, 109–110, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990).

The *Nockerts* case is helpful in deciding whether the phrase "scheduled as contractually due" refers to the debtor's bankruptcy schedules, or whether it has the common usage meaning of those payments which are to be made under the terms of the contract, i.e., the debt instrument. *Nockerts* surveyed the Bankruptcy Code for instances in which the operative words were used. It found that the term "scheduled as" was used only one time—the one cited by *Skaggs*—in § 1111(a). In that instance, the reference was clearly to the previous words in the same sentence, "appears in the schedules." In two instances, the word "scheduled" was used to refer to being listed on the bankruptcy schedules: in § 523(a)(3), regarding the nondischarge of a debt neither "listed nor scheduled under § 521(*l*)", and in § 554(c), pertaining to the deemed abandonment of property "scheduled under § 521(1)." [3] *Nockerts* also found that in two other instances the Bankruptcy Code used the word "scheduled" to refer to something other than the bankruptcy schedules: in

---

**3.** Section 521 requires the debtor to file bankruptcy schedules.

§ 524(k)(3)(H)(ii), regarding "payments scheduled" to repay reaffirmed debts and in § 1326(a)(1)(B), relating to preconfirmation payments "scheduled in a lease." From this survey the *Nockerts* court determined that "[w]hen describing the bankruptcy schedules, Congress included in the statute a reference to the schedules, either directly by name or indirectly by reference to § 521, the provision that requires the debtor to file bankruptcy schedules.[4] On the other hand, when the statute referred to scheduled payments, such as in the reaffirmation or preconfirmation lease provision, the bankruptcy schedules are not mentioned." *Nockerts*, at 503–04.

For these reasons, *Nockerts* disagreed with *Skaggs* and adopted *Walker's* conclusion that the correct interpretation of the words "scheduled as contractually due" was their common usage meaning of "those payments that the debtor will be required to make on certain dates in the future under the contract." *Id.* at *3 (quoting *Walker*, at *3). *Nockert's* considered analysis is convincing. If, however, the words "scheduled as" should be construed to refer to the debtor's bankruptcy schedules rather than to a common usage meaning, the same result would obtain in the present case. Under that assumption, the debtor here would be deemed to have "scheduled" the subject indebtedness because she listed it in her bankruptcy schedules. That her Statement of Intention declared that she would surrender the collateral would not somehow make the debt no longer "scheduled." The debt remains "scheduled" unless and until the debtor amends her schedules to delete it[5]. She has not filed such an amendment.

Thus, concluding that the subject debt was "scheduled", the question remains whether it was also "contractually due." There can be no doubt that when the debtor filed her bankruptcy petition, her contractual arrangement with her creditors required her to make payments on the subject indebtedness until the debt was paid in full. The only event which is alleged by the UST to have eliminated that obligation to pay was the debtor's expressed intention to surrender the collateral. This court has already addressed, and rejected, the *Love* and *Harris* proposition that the obligation to make scheduled payments is extinguished upon a debtor's surrender of the collateral securing the debt. Suffice to say here, that this court is of the firm opinion that a debtor's surrender of collateral would not render payments otherwise "contractually due" no longer "contractually due." Additionally, it must be remembered that, in the present case, the debtor has not surrendered the collateral. She has merely declared her intention to do so in the future. Whether she will ultimately do so is uncertain. It is at least conceivable that she might decide to reaffirm the debt. See *Walker*, at *4. Even the middle ground approach of *Singletary* recognizes that a statement of intention to surrender does not prevent the deduction for future payments on the debt.

◼ The UST urges that the expense deduction portion of the means test looks forward from the petition date, citing *Love*, rather than being a snapshot taken on the petition date, under the *Walker* approach. Otherwise, the UST contends, the actual expenses of the debtor over the 60–month post-petition period will not be

---

4. *Nockerts* found the only exception was in § 523(a)(10), where reference to the bankruptcy schedules was "abundantly clear." *Id.* at 503, footnote 2.

5. The court thus respectfully disagrees with the unstated but clear implication of *Skaggs* that the Statement of Intention rendered the debt listed on the debtor's schedules as no longer "scheduled."

reflected in the calculation. However, the means test does not purport to take into account a debtor's actual expenses in all respects. An example is the allowed deduction for amounts "specified under the National Standards and Local Standards," previously discussed. The argument that a deduction should not be allowed because it will not be an actual expense in the future is therefore unavailing. As *Nockerts* found, the means test is a rather arbitrary test which "substitutes formulaic calculations for judicial discretion." *Nockerts*, at 503–04 (*citing In re Hartwick*, 352 B.R. 867 (Bankr.D.Minn.2006)). Therefore, the "plain meaning" approach of *Walker* and *Nockerts* does not yield a result "demonstrably at odds with the intention of the drafters." Indeed, in this court's view, the *Nockerts* court was correct that "resort to the 'spirit' of the law is inappropriate and leads to misapplication of the statute." *Nockerts*, at 503–04. If Congress had intended to limit a debtor's deductions to obligations which the debtor intended to reaffirm and secured by collateral retained by the debtor, surely it would have so provided.

It may be tempting to adopt the reasoning of *Skaggs* and its progeny that allowing a debtor to deduct payments on a debt which the debtor does not intend to pay (because she will surrender the collateral) does not yield a true picture of the debtor's ability to repay her debts. In the abstract, that is a correct statement. However, as previously demonstrated, the very design of the means test calculation prevents it from being a quest to determine a debtor's true expenses, and thus her actual ability to repay her debts. Otherwise, there would be no deductions for any expenses other than actual ones.

For the above reasons, it is the ruling of this court that for purposes of the means test calculation, the debtor may deduct the payments at issue, despite her declared intent to surrender the collateral securing the debt. These payments are within the plain meaning of "scheduled as contractually due" as used in § 707(b)(2)(A)(iii)(I). Inasmuch as the parties have stipulated that allowing the deduction prevents the finding of a presumption of abuse, the court need not consider whether special circumstances exist.

Accordingly, the motion is denied.