Victor CONCEPCION, et al., Plaintiffs,

v.

Willis MORTON, et al., Defendants.

No. CIV.A.98–3681(MLC).

United States District Court,
D. New Jersey.

Dec. 21, 2000.

**113**

summary judgment on plaintiffs' civil rights claims.

### Factual Background

On August 6, 1998, plaintiffs Victor Concepcion ("Concepcion") and Anthony Ways ("Ways"),[1] inmates in the New Jersey State Prison ("NJSP"), commenced this action against various corrections officers and officials asserting that their civil rights, under 42 U.S.C. § 1983, were violated by these defendants through the exercise of excessive force during two separate incidents on August 18, 1997. Violations of the Fifth, Eighth, and Fourteenth Amendments are alleged. *See* Plaintiffs' *Second Amended Complaint* ¶¶ 11–26. In connection with this motion, each side has submitted a statement of uncontested facts, but the parties disagree on the pertinent facts surrounding the incidents which form the bases of plaintiffs' excessive force claims.[2]

### Concepcion Incident

According to the deposition testimony of Concepcion, on August 18, 1997, defendant Senior Corrections Officer Sellnow ("Sellnow") opened the cells on the second level of two tier, where Concepcion was housed, to permit the inmates to proceed to the cafeteria for morning breakfast (*i.e.* "morning mess"). *See* Concepcion Dep. Tr. 41–7 to –11, 43–17 to –22. After Concepcion exited his cell and as he saw Sellnow approach him in the narrow hallway, Concepcion turned to the side to enable Sellnow pass, but Sellnow "rammed his shoulder" into Concepcion's left shoulder. *See* Concepcion Dep. Tr. at 43–19 to 44–15. Concepcion asked Sellnow what the problem was and then simultaneously they began "swinging at each other right there." Concepcion Dep. Tr. 46–23 to 47–9. Con-

Paul J. Hirsch, Parsippany, NJ, Rodney D. Ray, Marlton, NJ, for Plaintiffs.

David M. Ragonese, Ronald L. Bollheimer, Deputy Attorneys General, Trenton, NJ, for Defendants.

### OPINION

WOLFSON, United States Magistrate Judge.

In this prisoner civil rights litigation, defendants, Willis Morton, Larry Cole, William Sellnow, George Phillips, James Gorman, and Robert Richter, have moved for summary judgment on all claims, pursuant to FED. R. CIV. P. 56(b). Defendants assert that judgment is appropriate because plaintiffs have failed to exhaust their administrative remedies and further, that their civil rights claims fail as a matter of law. The parties have consented to disposition of this case by a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). This Court, having reviewed the moving, opposition, and reply papers, as well as having heard oral argument from counsel on September 18, 2000, denies defendants' motion based upon exhaustion of administrative remedies, but grants in part and denies in part defendants' motion for

1. Richard Harrington was also an original plaintiff in this suit. Pursuant to a Consent Order entered on May 5, 2000, signed by Judge Mary L. Cooper, U.S.D.J., Harrington's claims were severed.

2. The Defendants' Statement of Uncontested Material Facts and the Affidavit of Deputy Attorney General Stephen Bird, which have

been submitted to the Court in connection with this motion, largely repeat the plaintiffs' deposition testimony and the administrative disciplinary proceedings against them. As such, the Court will refer directly to the plaintiffs' deposition transcripts and the affidavits of the disciplinary hearing officers.

cepcion has admitted to hitting Sellnow, which resulted in four stitches to his forehead, while Concepcion was not bleeding from the incident. Concepcion Dep. Tr. 48–20 to –22, 50–11 to –16; *see* Bird Aff., Exhibit 4, Sellnow Dep. Tr. 28–15 to –23.

Upon seeing the melee from a nearby desk, defendant Sergeant Cole ("Cole") called a "Code 33," which indicates that a fight has erupted. *See* Concepcion Dep. Tr. 50–17 to –23. Concepcion alleges that approximately 30 to 40 officers, lead by Cole, responded by running toward him and that he reacted by running the opposite way and then jumping from the second floor to the first floor, which is approximately a twelve-foot drop. *See* Concepcion Dep. Tr. 58–18 to 52–4, 52–25 to 53–21. Senior Corrections Officer Steven Gass ("Gass"), who was Sellnow's partner on that particular day, testified that he observed Sellnow fall backwards after Concepcion hit him, and that he saw Concepcion flee from the fight. *See* Bird Aff., Exhibit 6, Gass Dep. Tr. 14–2 to –4. Gass pursued Concepcion by jumping over the second floor railing. *See* Bird Aff., Exhibit 6, Gass Dep. Tr. 15–23 to 16–1. Gass further contends that Concepcion kept running on the first floor but that he cornered Concepcion "between the heater vent and the wall" on the first floor and was then able to restrain him. *See* Bird Aff., Exhibit 6, Gass Dep. Tr. 16–1 to –5.

Defendant Corrections Officer Phillips ("Phillips") also responded to the Code 33. *See* Bird Aff., Exhibit 7, Phillips Dep. Tr. 10–11 to –13. Upon seeing Sellnow's injuries, Phillips pursued Concepcion to the first floor. *See* Bird Aff., Exhibit 7, Phillips Dep. Tr. 10–20 to 11–5, 12–12 to –14. Several inmates were out of their cells at the time of pursuit because they were proceeding to morning mess. *See* Bird Aff., Exhibit 7, Phillips Dep. Tr. 12–17 to –20. Phillips helped restrain and handcuff Concepcion. *See* Bird Aff., Exhibit 7, Phillips Dep. Tr. 13–2 to –10. Concepcion contends that he was assaulted by Cole and Phillips after he was restrained; spe-

cifically, Concepcion alleges that Cole kicked him in his face, and that Phillips placed his night stick in between Concepcion's handcuffs and twisted, thereby cutting his skin and lifting Concepcion off of his feet, as well as "ramm[ing] his head into the cement wall." Concepcion Dep. Tr. 61–15 to –19, 64–4 to 65–7. Cole, Phillips, and two other officers subsequently escorted Concepcion to the medical clinic, and then to a detention cell on "one left." Concepcion Dep. Tr. 68–15 to –17, 73–16 to –21. Once in the detention cell, Concepcion claims that Phillips hit him on his "upper left forehead" with his night stick. Concepcion Dep. Tr. 78–18 to –24.

As a result of this incident, Concepcion was charged with violating N.J. Admin. Code tit. 10A, § 4–4.1(a).*002, Assaulting Any Person. *See* Knowles Aff. ¶ 4. A disciplinary hearing was held and on August 29, 1997, Concepcion was found guilty, and was thereby sanctioned to "15 days detention, 360 days loss of commutation time and 365 days administrative segregation." Knowles Aff. ¶ 4, Exhibit A. Concepcion appealed the ruling to Administrator Hendricks, who upheld the decision. *See* Concepcion Dep. Tr. 97–17 to –20. No further appeals were taken. *See* Concepcion Dep. Tr. 97–21 to 98–6.

### Ways Incident

On August 18, 1997, following lunch, inmate Ways exited the prison cafeteria through the holding cage with approximately 30 other inmates waiting to go through the metal detector. *See* Ways Dep. Tr. 24–9 to –25. Inmates must pass through the metal detector into the center rotunda, and then move to their respective hallways (*i.e.* "wings"), which contain the prisoners' cells. *See* Ways Dep. Tr. 24–19 to –25. Ways has testified that approximately twenty to twenty-five inmates had exited from the holding cage through the metal detector before him, and that when he approached the rotunda he observed a commotion. *See* Ways Dep. Tr. 28–13 to –23. In Ways' own words, there was "commotion going on," "[p]eople was [sic]

running, officers running, officers swinging sticks" all in the rotunda. Ways Dep. Tr. 26–17, 27–13 to –17. He further observed a male corrections officer and a female corrections officer down on the ground. *See* Ways Dep. Tr. 33–3 to –12. Ways asserts that as he attempted to negotiate through the melee to the six wing where he was housed, defendant Corrections Officer Richter ("Richter") approached him and punched him in the jaw. *See* Ways Dep. Tr. 37–1 to –16. According to Ways, he then reacted by pushing Richter's shoulder to block Richter's punch, which failed, and that consequently, Ways surrendered volitionally to Richter by dropping to the ground in a push-up position and was handcuffed. *See* Ways Dep. Tr. 37–9 to –17, 38–20 to 39–18, 40–11 to –20.

Once restrained, Ways was carried by defendant Corrections Officer Gorman ("Gorman"), Richter, and at least two other officers to the seven wing, where he was dropped face first, about three feet from the floor, and Richter kicked him once. *See* Ways Dep. Tr. 43–13 to –20, 45–18 to 46–15, 48–7 to –11. Ways alleges that he was treated for various injuries, including a fractured nose. *See* Ways Dep. Tr. 58–8 to 60–13.

Defendants assert that Ways attacked and broke the jaw of Officer Bleinstein, the female corrections officer who had fallen to the rotunda floor. *See* Defendants' Brief at 9 n. 2. However, Ways denies that he struck Bleinstein, *see* Ways Dep. Tr. 74–1 to –18, despite the fact that he pled guilty in the New Jersey Superior Court to a charge of Criminal Aggravated Assault, N.J. STAT. ANN. § 2C:12–1(b)(5) (West Supp.1999), for the assault on Bleinstein. *See* Bird Aff., Exhibit 8, Ways' Face Sheet. Ways was also charged with three separate violations of N.J. ADMIN. CODE tit. 10A, § 4–4.1(a).*002, Assaulting Any Person, for his assault on Richter, Gorman, and Bleinstein. *See* Burton Aff. ¶¶ 4–5; Knowles Aff. ¶ 5. A disciplinary hearing was held, and on August 26, 1997, a hearing officer found Ways guilty on all three

charges. *See* Burton Aff. ¶¶ 4–5; Knowles Aff. ¶ 5. He was thereby sanctioned to "30 days detention, 970 days loss of commutation time, 970 days administrative segregation, and 30 day loss of recreation privileges." *See* Burton Aff., Exhibits A, B; Knowles Aff, Exhibit B. Ways appealed the ruling to the prison administration, but the decision was upheld, *see* Ways Dep. Tr. 66–19 to 67–14, and similarly, his appeal to the Appellate Division of the New Jersey Superior Court was dismissed. *See* Ways Dep. Tr. 67–15 to 68–5.

Defendants have moved for summary judgment on the basis that Concepcion and Ways failed to avail themselves of the administrative remedy scheme set forth in the Inmate Handbook for the NJSP. *See id.* at 13. Plaintiffs oppose this motion by asserting that there are no administrative procedures or purported remedies for state prisoners to exhaust as evidenced by the failure of the New Jersey Department of Corrections ("NJDOC") to promulgate such an administrative procedure or remedy in the New Jersey Administrative Code. *See* Plaintiffs' Brief at 1. Defendants argue in the alternative, that if the Court finds in favor of the plaintiffs on the exhaustion issue, nonetheless summary judgment on plaintiffs' excessive force claims is warranted. *See* Defendants' Brief at 24–32.

### *Discussion*

#### A. *Summary Judgment Standard*

A court may enter summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED R. CIV. P. 56(c); *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir.2000) (citing FED R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir.1996). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 305 (3d

Cir.1999) (citations omitted). Once the moving party has satisfied this initial burden, the opposing party must establish that a genuine issue exists by supplying "specific facts which demonstrate that there exists a genuine issue for trial." *Orson*, 79 F.3d at 1366.

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. *See* FED R. CIV.P. 56(e); *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 (citing *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The Court must draw all reasonable inferences in the nonmoving party's favor, and must accept the party's evidence when considering the merits of the summary judgment motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.1986).

In deciding a motion for summary judgment, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks*, 204 F.3d at 105 n.5 (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505); *Big Apple BMW v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992). With this framework in mind, the Court shall analyze the facts of this case.

**B. *Exhaustion of Available Administrative Remedies***

Defendants argue that summary judgment should be entered in their favor because plaintiffs did not exhaust administrative remedies that were available to them at NJSP, as required by the Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a) (Supp. 2000). In that regard, defendants maintain that the Inmate Handbook for NJSP provides an administrative remedy which was available for plaintiffs' excessive force complaints. A copy of page 46 of the Handbook, entitled "Administrative Remedy," is attached to the affidavit of Deputy Attorney General Stephen Bird. *See* Bird Aff., Exhibit 5. The Handbook states that submission of an Administrative Remedy Form to the Administrator's Office "give[s] the inmate population a way to bring complaints, problems, suggestions, etc. to the attention of the Administration of New Jersey State Prison to solve or possibly put into use." *See id.*

The process begins by the inmate submitting an "Administrative Remedy Form" to the Administrator's Office. *See id.* Upon receipt, the Department Head writes a response on the form; this response is signed by the Primary Level Supervisor and the Department Head; and the response is finally reviewed and signed by the Intermediate Level Supervisor as the Administrator's designee. *See id.* The inmate complaint form with the administrative response is then placed in the inmate's Classification folder and the prisoner is given a copy. *See id.* No administrative appeal is permitted. *See id.*

Defendants assert that the superintendent's remedy procedure at NJSP is authorized by regulations promulgated by the NJDOC, entitled "Inmate Orientation and Handbook," N.J. ADMIN. CODE tit. 10A, § 8–1.1 to –3.6. These regulations authorize the superintendent to designate a staff person to develop the Handbook for the prison. N.J. ADMIN. CODE tit. 10A, § 8–3.1. The Handbook must explain the philosophy of the correctional facility, and include a description of the reception process, classification process, inmate correspondence, visits, telephone calls, inmate accounts, legal services, business activities, ombudsman, work opportunities, counseling opportunities, educational and religious

services, substance abuse treatment, medical and dental care, clothing, recreation, hygiene, personal property, housekeeping, name change procedures, community release programs, video conferencing, and parole/expiration of sentence issues. N.J. ADMIN. CODE tit. 10A, § 8–3.5.[3] However, the regulations do not authorize a superintendent to establish an administrative grievance procedure.[4] Nor do the NJDOC regulations contain an administrative grievance procedure applicable to state inmates or specifically, to inmate excessive force complaints. Indeed, plaintiffs correctly point out in their brief that the NJDOC regulations expressly require county jails to adopt "written inmate grievance procedure[s] ... which shall include at least one level of appeal," N.J. ADMIN. CODE tit. 10A, § 31–14.4, but that there is no corresponding provision for state penal institutions. This Court need not decide whether the establishment of a grievance procedure can be a delegable or non-delegable duty by the Agency to the prison, because the NJDOC did not even attempt to delegate the duty to the state prisons, as it did with the county jails.[5]

3. The regulations define "Inmate Handbook" as "a booklet that is provided to inmates which contains correctional facility rules and procedures, and information about services and programs." N.J. ADMIN. CODE tit. 10A, § 8–1.3. The regulations provide that each inmate is to be given a copy of the Handbook within two days of admission to the facility. N.J. ADMIN. CODE tit. 10A, § 8–3.2.

4. Under New Jersey law, the commissioner of the NJDOC is authorized to "[f]ormulate, adopt, issue and promulgate, in the name of the department such rules and regulations for the efficient conduct of the work and general administration of the department, the institutions or noninstitutional agencies within its jurisdiction, its officers and employees as may be authorized by law" and to "[d]etermine all matters of policy and regulate the administration of the institutions or noninstitutional agencies within his jurisdiction." N.J. STAT. ANN. §§ 30:1B–6(e), –6(g) (West Supp.2000).

5. NJDOC regulations do provide administrative remedies in regard to disciplinary sanc-

Thus, plaintiffs argue that § 1997e(a) is not a bar to their claims here because the NJDOC has no administrative remedies applicable to excessive force complaints. *See* Plaintiffs' Brief at 1–4. They maintain in essence that, because the superintendent's inmate grievance procedure at NJSP is not authorized by regulations of the NJDOC, it does not constitute an "administrative remedy" within the purview of § 1997e. *See id.*

■ The question in this case is narrow: Does an informal inmate complaint procedure established by a prison warden constitute an "administrative remedy" within the meaning of § 1997e(a)? According to the Second Circuit, this is a question of law for the court. *See Snider v. Melindez,* 199 F.3d 108 (2d Cir.1999). "[W]here a grievance procedure is informally established by the warden of a prison and therefore not ascertainable by examination of statutes or regulations, the existence of the procedure may be a matter of fact, but whether it qualifies as an administrative remedy that must be exhausted under Section 1997e(a) is a question of law." *Snider,* 199 F.3d at 114. No reported New Jersey case has addressed the precise is-

tions and placement in protective custody and the Security Threat Group Management Unit. *See* N.J. ADMIN. CODE tit. 10A, § 4–11.1 (administrative appeal from disciplinary decision); N.J. ADMIN. CODE tit. 10A, § 5–5.3 (administrative appeal of protective custody placement); N.J. ADMIN. CODE tit. 10A, § 5–6.11 (administrative appeal of confinement in Security Threat Group Management Unit). The Code is, however, silent on a grievance procedure.

Furthermore, defendants do not contend that the New Jersey Tort Claims Act, N.J. STAT. ANN. § 59:1–1 to –7 (1992), provides an administrative remedy within § 1997e(a). Nevertheless, the Court joins those federal courts which have held that Congress did not intend in § 1997e(a) to require prisoners to pursue state tort remedies before filing a federal civil rights complaint. *See, e.g., Rumbles v. Hill,* 182 F.3d 1064, 1069–70 (9th Cir. 1999); *Blas v. Endicott,* 31 F.Supp.2d 1131, 1132 (E.D.Wis.1999); *Lacey v.C.S.P. Solano Med. Staff,* 990 F.Supp. 1199, 1206–08 (E.D.Cal.1997).

sue presented here; instead, it appears to have simply been assumed that the Inmate Handbook grievance procedure constitutes an administrative remedy as contemplated by the PLRA. Thus, this Court must analyze this untested assumption and decide the issue as a matter of first impression in this jurisdiction.

■ A court determines the intended scope of a statute by examining "the language and structure, legislative history, and motivating policies." *Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (quoting *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980)). "As in all cases involving statutory construction, 'our starting point must be the language employed by Congress,' *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), and we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used,' *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982); *accord Government of V.I. v. Knight,* 989 F.2d 619, 633 (3d Cir.1993).

Section 1997e(a) of Title 42, as amended in 1996, provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (Supp.2000). The statute does not define the term "administrative remedy." "When terms used in a statute are undefined, we give them their ordinary meaning." *Asgrow Seed Co. v. Winterboer,* 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995). In addition, "Congress will be presumed to have legislated against the background of our traditional legal concepts." *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978).

The phrase "administrative remedy" as it is commonly used refers to "a nonjudicial remedy provided by an administrative agency." Black's Law Dictionary 1296 (7th ed.1999). The phrase "exhaustion of administrative remedies" describes "[t]he doctrine that, if an administrative remedy is provided by statute, a claimant must seek relief first from the administrative body before judicial relief is available." *Id.* at 594, 98 S.Ct. 2864.[6]

The phrase "administrative remedy" is not commonly used to describe an individual administrator's decision to consider and respond to complaints or suggestions. To be sure, a procedure authorizing an inmate to submit a complaint form to a prison administrator constitutes a "remedy," as that term is commonly used.[7] However, the plain language of § 1997e(a) does not require inmates to exhaust any available remedy, but only an available "administrative remedy." A construction of § 1997e(a) which eliminates the word "administrative" violates "the established principle that a court should give effect, if possible, to every clause and word of a statute." *Moskal v. United States,* 498 U.S. 103, 109, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (citations and internal quotation marks omitted).

■ The context of § 1997e(a) reinforces the notion that Congress intended "administrative remedy" to refer to an administrative scheme adopted by the

---

6. According to Black's Law Dictionary, "[t]he doctrine's purpose is to maintain comity between the courts and administrative agencies and to ensure that courts will not be burdened by cases in which judicial relief is unnecessary." Black's Law Dictionary 594 (7th ed.1999).

7. A remedy is "[t]he means of enforcing a right or preventing or redressing a wrong; legal or equitable relief." Black's Law Dictionary 1296 (7th ed.1999).

state department of corrections. "The meaning of statutory language, plain or not, depends on context." *Bailey v. United States,* 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (citation omitted). For example, § 1997e(b), refers to a state "administrative grievance procedure." *See* 42 U.S.C. § 1997e(b) (Supp. 2000). This section provides that "[t]he failure of a State to adopt or adhere to an administrative grievance procedure shall not constitute the basis for an action" by the Attorney General for deprivation of constitutional rights or privileges under the Civil Rights of Institutionalized Persons Act, ("CRIPA"), Pub.L. No. 96–247, § 7, 94 Stat. 352 (1980) (codified at 42 U.S.C. §§ 1997–1997j). This reference in the same statute to a state administrative grievance procedure indicates that Congress intended "administrative remedies" under § (a) to be administrative grievance procedures adopted by the agency responsible for operating prisons.

The predecessor of § 1997e(a) was originally enacted as part of CRIPA. Prior to the PLRA, § 1997e(a)(1) provided that, if a court determined that administrative remedies were in substantial compliance with specified minimum acceptable standards or were otherwise fair and effective and found that exhaustion was "appropriate and in the interests of justice" the court was required to continue a prisoner's § 1983 action in order to require "exhaustion of such plain, speedy, and effective administrative remedies as are available." 42 U.S.C. § 1997e(a)(1) (1994).[8] In 1996,

Congress amended § 1997e when it enacted the PLRA, Pub. L. No. 104–134, tit. I, § 101(a), 110 Stat. 1321–71 (Apr. 26, 1996), renumbered Pub. L. No. 104–140, tit. I, § 1(a), 110 Stat. 1327 (May 2, 1996). The PLRA amended the exhaustion aspect of § 1997e in several respects. It expanded the category of claims to include claims brought under "any other Federal law," but at the same time limited its scope to those "with respect to prison conditions." Further, the PLRA changed the requirement that a court continue the action for up to 180 days to require exhaustion if it would be "appropriate and in the interests of justice" to a mandate which prohibits an inmate from bringing an action unless available administrative remedies have been exhausted. Most significantly, the pre-PLRA version of § 1997e required exhaustion only if available administrative remedies were "plain, speedy, and effective," and if the Attorney General certified, or the court determined, that the administrative remedies substantially complied with minimum acceptable standards.

While Congress clearly intended in the PLRA to delete the requirement that administrative remedies be "plain, speedy, and effective," nothing in the PLRA indicates that Congress intended to broaden the scope of remedies to be exhausted to include remedies which are not conventionally understood as administrative. Rather, the PLRA imported verbatim from CRIPA the phrase "administrative remedies as are available."[9] Although the legislative his-

---

**8.** Prior to the PLRA, the exhaustion provision of § 1997e(a) read as follows:

> § 1997e. Suits by Prisoners
> (a) Applicability of administrative remedies
> (1) Subject to the provisions of paragraph (2), in any action brought pursuant to section 1983 of this title by an adult convicted of a crime confined in any jail, prison, or other correctional facility, the court shall, if the court believes that such a requirement would be appropriate and in the interests of justice, continue such case for a period of not to exceed 180 days in order to require exhaustion of such plain, speedy,

and effective administrative remedies as are available.
> (2) The exhaustion of administrative remedies under paragraph (1) may not be required unless the Attorney General has certified or the court has determined that such administrative remedies are in substantial compliance with the minimum acceptable standards promulgated under subsection (b) of this section or are otherwise fair and effective.
> 42 U.S.C. § 1997e(a) (1994).

**9.** Under the old version of the statute, prisoners could be required to exhaust "such plain,

tory of the PLRA does not address the question at issue in this case, it is clear from the legislative history of CRIPA that the phrase "administrative remedies" meant administrative schemes promulgated by an agency. For example, the Conference Report on CRIPA states that Congress added the language retained in the current § 1997e(b) "to stress the voluntary aspect of the decision by a state or local agency to adopt a grievance procedure." H.R. CONF. REP. No. 96–897, § 7 (Apr. 22, 1980).

Likewise, Supreme Court precedent has consistently considered "administrative remedies" to be remedies promulgated by an agency. As early as 1956, the Supreme Court explained that the doctrine of exhaustion of administrative remedies "applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *see also Reiter v. Cooper*, 507 U.S. 258, 269, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) ("Where relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts; and until that recourse is exhausted, suit is premature and must be dismissed."); *McKart v. United States*, 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (Because an "administrative agency is created as a separate entity and invested with certain powers and duties, ... the exhaustion doctrine is ... an expression of executive and administrative

autonomy.") (citation and internal quotation marks omitted).

Exceptions to § 1983's general no-exhaustion rule are to be narrowly construed.[10] In *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), the Supreme Court held that the exhaustion of state administrative remedies is not a prerequisite to an action under § 1983. The Court observed that § 1997e "carv[ed] out a narrow exception to the general no-exhaustion rule to govern certain prisoner claims." *Id.* at 510, 102 S.Ct. 2557.[11] "With the understanding that exhaustion generally is not required, Congress decided to adopt the limited exhaustion requirement of § 1997e in order to relieve the burden on the federal courts, ... and also to encourage the States to develop appropriate grievance procedures." *Id.* at 509, 102 S.Ct. 2557; *see also McCarthy v. Madigan*, 503 U.S. 140, 150, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) ("Section 1997e imposes a limited exhaustion requirement for a claim brought by a state prisoner under ... § 1983, provided that the underlying state prison administrative remedy meets specified standards.").

Moreover, in interpreting § 1997e(a), the Third Circuit assumed that the exhaustion requirement referred to state administrative procedures contained in prison regulations. In *Jenkins v. Morton*, 148 F.3d 257 (3d Cir.1998), the Third Circuit Court rejected the argument that § 1997e(a) requires New Jersey prisoners to exhaust state judicial remedies before bringing a federal complaint challenging a disciplinary sanction. The Third Circuit reversed

---

speedy, and effective administrative remedies as are available." 42 U.S.C. § 1997e(a)(1) (1994). The PLRA deleted the adjectives "plain, speedy, and effective," but retained the phrase "such administrative remedies as are available."

**10.** The "very purpose" of § 1983 was "to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of

state law, whether that action be executive legislative, or judicial." *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972) (citation and internal quotation marks omitted).

**11.** *See also Heck v. Humphrey*, 512 U.S. 477, 480, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (stating that exhaustion of state administrative remedies ordinarily " 'is not a prerequisite to an action under § 1983,' even an action by a state prisoner") (citation omitted).

an order dismissing a New Jersey inmate's constitutional challenge to disciplinary sanctions under § 1997e(a) because, by administratively appealing the disciplinary sanction pursuant to N.J. ADMIN. CODE tit.. 10A, § 4–11.1, the inmate had exhausted " 'administrative remedies' as that term is conventionally understood." *Jenkins,* 148 F.3d at 259.[12]

Because the plain language of § 1997e(a) includes only remedies which are "administrative" in nature and "policy considerations alone cannot justify judicially imposed exhaustion unless exhaustion is consistent with congressional intent," *Jenkins v. Morton,* 148 F.3d 257, 259 (3d Cir.1998) (quoting *Patsy,* 457 U.S. at 513, 102 S.Ct. 2557), the Court finds that § 1997e(a) does not require plaintiffs to exhaust the remedy available in the NJSP Inmate Handbook. This Court finds that the NJDOC has failed to enact an administrative remedy for grievances in the state prison system and thus, there is no administrative remedy capable of being exhausted. NJSP's attempt to fill that void by establishing a grievance process in its Handbook [13] is unavailing—that duty belongs to the NJDOC. Defendants' motion to dismiss the complaint for failure to exhaust available administrative remedies pursuant to § 1997e(a) is denied. Thus, the Court will address defendants' motion regarding the sufficiency of plaintiffs' excessive force claims.

**12.** Most, if not all, federal circuit courts considering the scope of § 1997e(a) did so by examining administrative grievance schemes adopted by statute or promulgated by regulation. *See, e.g., Booth v. Churner,* 206 F.3d 289, 293 n.2 (3d Cir.2000) (Commonwealth of Pennsylvania's Department of Corrections regulations include Consolidated Inmate Grievance System), *cert. granted,* —— U.S. ——, 121 S.Ct. 377, 148 L.Ed.2d 291 (2000); *Nyhuis v. Reno,* 204 F.3d 65 (3d Cir.2000) (federal Bureau of Prison's Administrative Remedy Program, 28 C.F.R. §§ 542.10–542.18); *Wolff v. Moore,* 199 F.3d 324, 327 & n.4 (6th Cir.1999) (Ohio Administrative Code contains standard inmate grievance procedures and administrative procedures in re-

## C. *Excessive Force*

42 U.S.C. § 1983 provides a remedy to persons, including prisoners, whose constitutional or statutory rights have been violated by persons acting under the color of state law. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Brooks v. Kyler,* 204 F.3d 102, 106 (3d Cir.2000) ("After conviction, the Eighth Amendment serves as the primary source of substantive protection in cases where an inmate challenges a prison official's use of force as excessive and unjustified." (citations omitted)). "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (citing *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Here, the constitutional right asserted by plaintiffs is the right to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments. *See* Plaintiffs' Brief at 6–8. Specifically, plaintiffs allege that defendants violated their constitutional rights by using excessive force during the August 18, 1997 incidents. *See id.* at 8–10.

■ In an excessive force action by an inmate, a prisoner must satisfy a two-part

gard to use of force); *Hartsfield v. Vidor,* 199 F.3d 305, 309 (6th Cir.1999) (Michigan Department of Corrections regulations contain inmate grievance procedures); *Harris v. Hegmann,* 198 F.3d 153, 157 (5th Cir.1999) (Louisiana statute authorizes Department of Corrections to promulgate administrative complaint procedures for prisons); *Miller v. Tanner,* 196 F.3d 1190 (11th Cir.1999) (Georgia Department of Corrections promulgation of the Standard Operating Procedures for inmate grievances); *Wyatt v. Leonard,* 193 F.3d 876, 879–80 (6th Cir.1999) (inmate grievance procedures in Ohio Administrative Code).

**13.** Indeed, titling the internally drafted procedure "Administrative Remedy" does not make it so under the law.

test articulated by the Supreme Court in *Hudson.* The first prong is subjective and requires an inmate to prove that " 'the [security] measure taken inflicted unnecessary and wanton pain and suffering.' " *Hudson,* 503 U.S. at 6, 112 S.Ct. 995 (quoting *Whitley,* 475 U.S. at 320–21, 106 S.Ct. 1078). This standard requires that an inmate prove that prison officials acted with a culpable state of mind, that is, " 'whether [the] force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Id.* at 6, 112 S.Ct. 995. Thus, summary judgment is appropriate only when the evidence, viewed in the light most favorable to the plaintiff, "support[s] a reliable inference of wantonness in the infliction of pain." *Whitley,* 475 U.S. at 322, 106 S.Ct. 1078.

■ To determine whether excessive force was used in "good faith" or "maliciously and sadistically," courts have identified several factors, including:

> (1) "the need of the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them"; and (5) "any efforts made to temper the severity of a forceful response."

*Brooks,* 204 F.3d at 106 (quoting *Whitley,* 475 U.S. at 321, 106 S.Ct. 1078); *see Hudson,* 503 U.S. at 7, 112 S.Ct. 995. Clearly then, not all use of force rises to the level of a constitutional violation. *See Whitley,* 475 U.S. at 319, 106 S.Ct. 1078 ("The infliction of pain in the course of a prison security measure ... does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."); *Brooks,* 204 F.3d at 107 ("*Hudson* dictates that we must assess the degree of force

employed in relation to the apparent need for it.").

In *Whitley,* prisoner Albers was incarcerated in the Oregon State Penitentiary, when several prisoners became disturbed by the guards' forceful treatment of several intoxicated inmates. 475 U.S. at 314, 106 S.Ct. 1078. As a result, a group of inmates attacked the guards and took one correctional officer hostage. *Id.* at 314–15, 106 S.Ct. 1078. Led by prison security prison manager Whitley, an armed assault team executed a plan to free the hostage and suppress the riot, in the course of which prison officials shot prisoner Albers in the leg. *Id.* at 316, 106 S.Ct. 1078. Albers subsequently brought an excessive force claim against prison officials under 42 U.S.C. § 1983, for violating his Eighth and Fourteenth Amendment rights. *Id.* at 317, 106 S.Ct. 1078.

Justice O'Connor, writing for the majority, held that in such a tumultuous context, the evidence did not "support a reliable inference of wantonness in the infliction of pain." *See id.* at 322, 106 S.Ct. 1078. The Court explained that given the dangerousness of the situation, *i.e.* inmates controlling the cellblock with some inmates armed and several remaining out of their cells, prison officials acted with "a good-faith effort to restore prison security." *Id.* at 326, 106 S.Ct. 1078. Although Albers adduced expert evidence that indicated that prison officials could have regained order via other forms of non-deadly force, the Court maintained that "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id.* at 319, 106 S.Ct. 1078. Moreover, prison officials, who are better equipped to handle such occurrences, are entitled to deference, such that "neither judge nor jury [may] freely substitute their judgment for that of officials who have made a considered choice." *Id.* at 322, 106 S.Ct. 1078.

■ The second prong of the *Hudson* test is objective, and requires an inmate to

prove that prison officials' actions, taken contextually, do not comport with " 'contemporary standards of decency.' " *Hudson*, 503 U.S. at 8, 112 S.Ct. 995 (quoting *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.* at 9, 112 S.Ct. 995 (citing *Whitley*, 475 U.S. at 327, 106 S.Ct. 1078). In other words, whether the force applied by prison guards is excessive depends upon the contextual situation in which the alleged violation occurred. *See id.* at 8–9, 112 S.Ct. 995.

In *Hudson*, after an argument between inmate Hudson and prison guard McMillian, Hudson was handcuffed and shackled and then escorted to the administrative lockdown area. 503 U.S. at 4, 112 S.Ct. 995. The guards beat Hudson while escorting him to the lockdown area, which caused Hudson minor bruises, facial swelling, loosened teeth, and a cracked dental plate, but no more serious injuries. *Id.* Hudson then brought a claim for excessive force under § 1983. *Id.* The Court found that given the context in which the beating occurred, that Hudson was handcuffed and shackled and being moved to administrative lockdown by prison guards, the guards may have violated Hudson's Eighth Amendment rights, even though Hudson did not sustain a serious injury. *Id.* at 9–10, 112 S.Ct. 995. The Court stated that "the extent of Hudson's injuries ... provides no basis for dismissal of his § 1983 claim"; rather, even a de minimis use of physical force can violate the constitution if it is "of a sort 'repugnant to the conscience of mankind,' " such that "contemporary standards of decency" are violated. *Id.* at 10, 112 S.Ct. 995 (quotation omitted); *cf. Whitley*, 475 U.S. at 322–26, 106 S.Ct. 1078 (holding that in the context of riotous prison conditions, prison officials' shooting the plaintiff prisoner in the leg did not violate the Eighth Amendment).

### 1. *Plaintiff's Evidence*

■ In determining whether plaintiffs' claims of excessive force are sufficient as a matter of law, the Court may not consider evidence that implies that the disciplinary punishments imposed against the plaintiffs are invalid. Thus, any facts used as a basis for plaintiffs' excessive force claims cannot contradict the disciplinary proceedings arising from this same incident, unless the finding of guilt has been reversed or otherwise impaired. *See Heck v. Humphrey*, 512 U.S. 477, 485–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *see also Edwards v. Balisok*, 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997) (holding that a § 1983 claim that would imply the invalidity of a disciplinary hearing and thus sanctions was not cognizable).

In *Nelson v. Jashurek*, defendant police officer Jashurek attempted to arrest the plaintiff for parole violations. 109 F.3d 142, 143–44 (3d Cir.1997). Plaintiff resisted arrest and a struggle arose, which resulted in plaintiff being charged and convicted of resisting arrest under Pennsylvania law. *Id.* at 144. Plaintiff's conviction was not overturned or impaired. *Id.* Plaintiff then filed a § 1983 claim against Jashurek for excessive force. *See id.* at 145. The Third Circuit held that the plaintiff could maintain his civil suit against the officer because his conviction showed only that Jashurek used "substantial force" to arrest him and not whether "Jashurek used excessive 'substantial force,' " which could imply that the conviction was invalid. *Id.* at 145. Thus, the court was clear that for purposes of the civil action, it was established that Jashurek was justified in using substantial force. *Id.* at 146. To hold otherwise would violate the principle elucidated in *Heck. See id.*

In accordance with these principles, Concepcion and Ways may not assert any facts in support of their excessive force claim that would question the validity of the disciplinary judgments against them. Concepcion was found guilty by a disciplin-

ary hearing officer of one count of Assaulting Any Person, N.J. ADMIN. CODE tit. 10A, § 4–4.1(a).*002,[14] for his assault on Officer Sellnow. *See* Knowles Aff. ¶ 4. Concepcion appealed the ruling to Administrator Hendricks, who upheld the decision. *See* Concepcion Dep. Tr. 97–17 to – 20. No further appeals were taken. *See* Concepcion Dep. Tr. 97–21 to 98–6. Thus, Concepcion's "finding of guilt has [not] been reversed or otherwise impaired." *See Heck*, 512 U.S. at 485–87, 114 S.Ct. 2364. Ways was convicted of three counts of Assaulting Any Person for his assaults on officers Bleinstein, Gorman, and Richter. Ways appealed the ruling to the prison administration, but the hearing officer's decision was upheld. *See* Ways Dep. Tr. 66–19 to 67–14. Ways then filed an appeal with the Appellate Division of the New Jersey Superior Court, which dismissed the appeal. *See* Ways Dep. Tr. 67–15 to 68–5. Thus, Ways' conviction has not been "reversed or otherwise impaired." In addition, Ways pled guilty in the New Jersey Superior Court to a charge of Criminal Aggravated Assault, N.J. STAT. ANN. § 2C:12–1(b)(5) (West Supp.1999), for the assault on Bleinstein. *See* Bird Aff., Exhibit 8, Ways' Face Sheet. According to Ways' Face Sheet, the aggravated assault conviction has neither been reversed nor otherwise impaired. *See* Bird Aff., Exhibit 8, Ways' Face Sheet. Thus, under the principles of *Heck* and *Edwards*, the Court shall not consider Ways' denial that he struck Bleinstein, because it would imply the invalidity of his aggravated assault conviction. *See* Ways Dep. Tr. 74–1 to –18.

### 2. *Concepcion's Excessive Force Claims*

■ Concepcion claims that correctional officers Sellnow, Cole, and Phillips used excessive force against him. The Court finds that Concepcion has not produced sufficient evidence that the officers used excessive force prior to his restraint to defeat summary judgment. Concepcion's assault on defendant Sellnow occurred when Sellnow opened the cells to permit the inmates to proceed to the cafeteria for morning mess. *See* Concepcion Dep. Tr. 41–7 to –11. Concepcion testified that he and Sellnow bumped into each other in the hallway and that they began swinging at each other "simultaneously." *See* Concepcion Dep. Tr. 46–23 to 47–9. There is no evidence that Sellnow provoked the assault by using force against Concepcion which could "support[ ] a reliable inference of wantonness in the infliction of pain." *See Whitley*, 475 U.S. at 322, 106 S.Ct. 1078. As for the objective prong of the *Hudson* test, the force Sellnow used to fend off Concepcion's assault does not offend contemporary standards of decency. Although a serious injury is not required under *Hudson* to prove an Eight Amendment violation, it is noteworthy that Concepcion did not suffer any serious injury from the fight, unlike Sellnow who needed four stitches to his forehead. Furthermore, Concepcion was convicted of assaulting Sellnow in the disciplinary proceeding, which conviction has not been "reversed or otherwise impaired." *See Heck*, 512 U.S. at 485–87, 114 S.Ct. 2364. There are no allegations against Sellnow following this assault or when Concepcion was restrained. Thus, the Court finds that Sellnow did not use excessive force against inmate Concepcion.

With respect to Cole and Phillips, Concepcion's testimony confirms that he responded to the officers who attempted to restrain him after his assault on Sellnow by fleeing in the opposite direction, and that he jumped to the first floor, all during

14. N.J. ADMIN. CODE tit. 10A, § 4–4.1 provides in pertinent part: "An inmate who commits one or more of the following prohibited acts shall be subject to disciplinary action and a sanction that is imposed by a Disciplinary Hearing Officer .... Prohibited acts preceded by an asterisk are considered the most serious and result in the most severe sanctions." The charge of Assaulting Any Person is listed as " *.002"; thus, this charge is one of most severe disciplinary charges of which an inmate can be convicted. *See id.*

the morning mess movement when several inmates were out of their cells. *See* Concepcion Dep. Tr. 53–3 to –21; Bird Aff., Exhibit 7, Phillips Dep. Tr. 12–17 to –18. Cole witnessed the assault firsthand and knew that Concepcion was responsible for Sellnow's injuries. *See* Concepcion Dep. Tr. 49–1 to –5. Phillips, however, did not know how Sellnow was injured, only that Sellnow's "face was full of blood" and that Sellnow may have possibly been stabbed. *See* Bird Aff., Exhibit 7, Phillips Dep. Tr. 10–3 to –7. Furthermore, when Cole, Phillips, and several other officers attempted to restrain him, Concepcion struggled and resisted being handcuffed. Here, unlike the situation in *Hudson* where the guards used force against inmate Hudson for no apparent reason, Concepcion had just assaulted Sellnow and was resisting being restrained. Thus, up to and including the point of being restrained, the Court finds that the force used by Cole and Phillips to restrain Concepcion was used in "good faith" with the intention to "restore discipline." On this record, Concepcion has not adduced adequate proof that Cole or Phillips acted with the subjective intent to inflict "unnecessary and wanton pain and suffering." *See Hudson*, 503 U.S. at 6, 112 S.Ct. 995.

In addition, Concepcion has not produced evidence that Cole's and Phillips' actions did not objectively comport with "contemporary standards of decency." At the time of the assault, several inmates were out of their cells moving to and from mess. A number of people, including staff, officers, administrators, and other inmates, were potentially at risk from Concepcion's actions. The *Whitley* Court found that a gunshot wound inflicted in a similarly tumultuous context did not violate the Eighth Amendment. Thus, viewing the evidence most favorably to Concepcion, the Court must nonetheless find that the force used on Concepcion, up to and including his restraint, did not violate contemporary standards of decency. In accordance with *Hudson*, the Court will not use hindsight to second guess the actions of the correc-

tional officers who perceived a dangerous situation. In such precarious situations, prison personnel are afforded great deference. *See Hudson*, 503 U.S. at 6, 112 S.Ct. 995 (quoting *Whitley*, 475 U.S. at 321–22, 106 S.Ct. 1078).

■ However, after Concepcion was restrained, the urgency to restore order had abated. Concepcion has testified that after he was restrained, he was assaulted by Cole and Phillips; that Cole kicked him in the face; that Phillips placed his night stick in between Concepcion's handcuffs and twisted, thereby cutting Concepcion's skin and lifting him off of his feet; and that Phillips rammed his head into the cement wall. *See* Concepcion Dep. Tr. 61–1 to –19, 64–4 to –11, 64–21 to –23. Concepcion also testified that Phillips and Cole took him to a detention cell and that Phillips assaulted him with his night stick on his face. *See* Concepcion Dep. Tr. 78–1 to –25. At this point, the melee was controlled and there was no longer any danger of an uprising. *See Hudson*, 503 U.S. at 4, 9–10, 112 S.Ct. 995 (stating that Hudson's Eighth Amendment rights may have been violated when prison guards beat him after he was restrained and there was no imminent threat of prison disturbance). For the purposes of this motion, the Court must accept Concepcion's allegations as true. Thus, whether the force used by Cole and Phillips was employed in good faith after Concepcion's restraint is a factual question for a jury to determine. *See Whitley*, 475 U.S. at 320–21, 106 S.Ct. 1078 (stating that the touchstone for whether "the measure taken inflicted unnecessary and wanton pain and suffering" ultimately turns on whether the force was applied in good faith to maintain or restore discipline). Furthermore, the Court finds that whether the actions of Phillips and Cole comported with contemporary standards of decency, given that the threat of a prison disturbance was quelled, is also a question for a jury to decide.

### 3. *Ways' Excessive Force Claims*

Ways asserts that officers Richter and Gorman used excessive force against him. Ways has testified that as he left the holding cage outside of the cafeteria, he observed a male corrections officer and a female corrections officer down on the ground. Ways Dep. Tr. 25–17 to –22, 33–3 to –12. As he attempted to return to his cage on the six wing, Ways Dep. Tr. 32–11 to –15, Ways contends that defendant Richter punched him in the jaw; that Ways reacted by pushing Richter's shoulder to block the punch, which failed; and that consequently, Ways voluntarily surrendered to Richter by dropping to the ground where he was handcuffed. Ways Dep. Tr. 37–1 to 40–20.

■ Similar to Concepcion, the Court finds, as a matter of law, that up to and including Ways' restraint, the force used by Richter and Gorman was not excessive. Defendants assert that the actions of Richter and Gorman taken against Ways were in response to Ways punching and breaking Bleinstein's jaw. *See* Bird Aff., Exhibit 3, Gorman Dep. Tr. 16–5 to –12. The Court must accept these allegations as true; otherwise, it would cast doubt on the validity of Ways' criminal conviction for Criminal Aggravated Assault against Bleinstein. *See Heck,* 512 U.S. at 485–87, 114 S.Ct. 2364. The assault on Bleinstein occurred in the center of the prison rotunda, where several inmates were out of their cells moving to and from the cafeteria. Given the perceived threat of an uprising, the Court finds that the force used by Richter and Gorman to subdue Ways was not malicious or sadistic; rather, any force used by the officers was a byproduct of the officers' exigent need to restore order and thus comported with contemporary standards of decency.

■ However, after Ways was restrained, the need to restore order ceased and the Court cannot say that officers Richter and Gorman used an appropriate degree of force. Ways testified that once he was restrained, he was carried by Gorman and Richter and two other officers, where Ways claims he was dropped face first, about three feet from the floor, and that Richter kicked him once. *See* Ways Dep. Tr. 45–20 to –22, 48–24 to –25. Ways alleges that he suffered various injuries, including a fractured nose. *See* Ways Dep. Tr. 58–8 to 60–13. When viewing Ways' allegations in the light most favorable to him, the Court finds that whether the use of force by Richter and Gorman after Ways was restrained was excessive is a question of fact for a jury to decide.

### D. *Negligent Conduct*

The defendants have also moved for summary judgment on Counts Five and Six of plaintiffs' seconded amended complaint. Count Five alleges that defendants Richter, Gorman, Phillips, Sellnow, and Cole engaged in the negligent use of excessive force and gross negligence in violation of the Fifth, Eighth, and Fourteenth Amendments. *See* Plaintiffs' Second Amended Complaint ¶¶ 28–29. Count Six alleges that defendant Morton and John Smith 1–13 negligently failed to train, supervise, and control the other defendants in violation of the Fifth, Eighth, and Fourteenth Amendments. *See* Plaintiffs' Second Amended Complaint ¶¶ 31–32.

■ However, negligence claims are insufficient to impose liability under 42 U.S.C. § 1983. *See Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). "[I]n any given § 1983 suit, the plaintiff must still prove a violation of the underlying constitutional right; and depending on the right, merely negligent conduct may not be enough to state a claim." *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986) (citations omitted). Furthermore, "the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials." *Id.* at 348, 106 S.Ct. 677. Thus, plaintiffs allegation that the

defendants' conduct amounted to negligence, as a matter of law, is untenable.

As for plaintiffs' claim that the defendants acted with gross negligence,[15] defendants assert that this claim is duplicative of plaintiffs' excessive force claims. This Court disagrees. While the Supreme Court in *Daniels* declined to consider whether recklessness or gross negligence would trigger Due Process protections, 474 U.S. at 334 n.3, 106 S.Ct. 677, the Third Circuit has, on the other hand, viewed gross negligence as a separate basis for a civil rights claim. *See Metzger v. Osbeck*, 841 F.2d 518, 520 n.1 (3d Cir.1988) ("Although the Supreme Court has had no occasion to consider whether something less than intentional conduct, such as recklessness or gross negligence is enough to trigger the protections of the Due Process Clause, this court has recently reaffirmed its position . . . that when a state actor has infringed a liberty interest by intentional conduct, gross negligence, reckless indifference . . . the matter is actionable under section 1983."(citations and internal quotation marks omitted)). Thus, unlike mere negligence, the Third Circuit has determined that reckless indifference or gross negligence may be sufficient to state a claim under the Due Process Clause and thus is actionable under § 1983. *See Metzger*, 841 F.2d at 518 (holding that a student's due process claim against a teacher for excessive discipline precluded summary judgment because gross negligence is sufficient to trigger due process protections); *Colburn v. Upper Darby Township*, 838 F.2d 663 (3d Cir.1988) (holding that a detainee's suicide is cognizable under § 1983 because prison officials who knew or should have known of detainee's suicide risk may have violated detainee's due process rights); *Irvin v. Borough of Darby*, 937 F.Supp. 446 (E.D.Pa.1996) (holding that reckless conduct is sufficient for arrestee to assert a § 1983 against the

Darby Borough). However, since plaintiffs' claims of gross negligence piggyback on their allegations of excessive force, the limitation previously imposed in this opinion, that the excessive force claims can only survive for actions taken by defendants, Cole, Gorman, Phillips, and Richter, after the plaintiffs were handcuffed or restrained, applies equally to the gross negligence claims. Accordingly, as a matter of law, the Court denies summary judgment on Count Five of plaintiffs' amended complaint on the claims of gross negligence but grants summary judgment on the negligence claims.

### E. *Supervisory Liability*

The defendants have also moved for summary judgment on Count Seven of plaintiff's second amended complaint, which alleges that defendants Morton and John Smith 1–13 failed to provide adequate training and supervision to their corrections officers in violation of plaintiffs' Fifth, Eighth, and Fourteenth Amendment rights. *See* Plaintiffs' Second Amended Complaint ¶ 34. Plaintiffs contend that this violation was "willful" and constitutes a "deliberate disregard for the value of human life." *See id.* In essence, plaintiffs are attempting to use a respondeat superior theory of liability to demonstrate a civil rights violation under § 1983.

 Supervisory administrators are not liable for violations of § 1983 solely on a theory of respondeat superior. *See City of Okl. City v. Tuttle*, 471 U.S. 808, 824 n. 8, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845

---

**15.** In *Williams v. Borough of West Chester*, 891 F.2d 458, 464 n.10 (3d Cir.1989), the Third Circuit indicated that it would not draw distinctions between the terms "gross negligence," "reckless indifference," "deliberate indifference," or "reckless disregard"; consequently, these terms essentially indicate the same degree of intent.

F.2d 1195, 1207 (3d Cir.1988) (citations omitted). Thus, an "affirmative link" between the constitutional violation and the official sued must be established in order to hold the official liable. *See Oklahoma City,* 471 U.S. at 824 n.8, 105 S.Ct. 2427.

Here, plaintiffs have not proven that defendant Morton personally directed, possessed actual knowledge, or acquiesced in the alleged excessive force incidents that occurred on August 18, 1997. The plaintiffs have produced no evidence to support the allegation that defendant Morton played any part whatsoever in the actions of the officer defendants. As set forth *supra,* it is insufficient as a matter of law to state that Morton supervised the other defendants. Therefore, summary judgement is entered on Count Seven of plaintiffs' amended complaint and defendant Morton and the John Smith defendants are hereby dismissed from the action. An appropriate order follows.